THOMPSON, Presiding Judge.
Jesse Stutts, Inc. (“Stutts”), appeals from a judgment entered by the Madison *157 Circuit Court (“the trial court”) finding that a recent back injury suffered by William H. Hughey was caused by injuries that Hughey had received in a 2002 accident that arose out of his employment with Stutts. The trial court ordered Stutts to approve and pay for the treatment of the current injury, including surgery. The trial court also found Stutts and its workers’ compensation claims administrator in contempt for violating the “future-medical provisions” of a 2004 settlement agreement into which the parties had entered to resolve issues arising out of the 2002 accident.[1]
The record indicates the following. Hu-ghey suffered a number of injuries in the 2002 accident, including three compression fractures to his spine at the T6, Til, and L2 levels. In May 2003, Hughey underwent kyphoplasty surgery to ease the pain caused by the compression fractures. According to the record, kyphoplasty surgery involves injecting “medical cement” into the fractures. After that procedure, Hu-ghey went to physical therapy. Because he was still experiencing back pain, Hu-ghey was referred to Dr. John Roberts, a pain-management specialist, in 2004. Dr. Roberts has provided treatment to Hu-ghey continuously from 2004 and was still treating him at the time of the trial.
Dr. Roberts testified in his deposition that, when he first began treating Hughey, Hughey complained of back pain and left-leg pain “that was in an L5-S1 distribution.” Dr. Roberts explained that, although the compression fractures were higher in Hughey’s back than the L5-S1 level, anything that affects components of the spine “can ultimately impact the nerve,” causing nerve pain down one’s leg. As part of his treatment for managing Hughey’s pain, Dr. Roberts provided Hu-ghey with numerous injections and blocks at intervals of time. Through the years, Dr. Roberts has also prescribed numerous pain medications, including some narcotics, to relieve Hughey’s pain.
In August 2006, Hughey wrote a letter, addressed to “To Whom It May Concern,” stating that the injections he received from Dr. Roberts helped not only with his back pain, but also “with the problem with my right and left legs just losing all stability.” He went on to say in the letter that he had fallen several times because his legs “collapse” on him. In his deposition, Dr. Roberts testified that the residual pain Hu-ghey continues to have as a result of the compression fractures “can make you feel weak or feel like you can’t support your body and need to sit down.”
On June 6, 2011, Dr. Roberts saw Hu-ghey and gave him his regularly scheduled set of injections. Hughey returned to Dr. Roberts on July 11, 2011. According to a nursing note made on that visit, Hughey reported that he had fallen at work and hurt his back. At that time, Hughey was working as a cook and dishwasher at a Cracker Barrel restaurant. In his deposition, which is included in the record, Hu-ghey was asked whether he was ever injured while working for Cracker Barrel. He said that in September 2011 his legs “gave out” on him, causing him to fall “flat on [his] back.” He said that the fall hurt his head and his “whole back area, especially in my butt area.” Hughey said that he reported the incident to his supervisor and that his supervisor filled out an incident report. Hughey testified that, after his fall, he was “given a paper” to go see a doctor at Athens Hospital. However, Hu- *158 ghey said, he decided not to seek treatment or workers’ compensation benefits from Cracker Barrel as a result of that fall, because, he said, “it wasn’t Cracker Barrel’s fault.” Instead, Hughey said, his leg gave out on him because he had not had his injection. He explained that he had to have his injections at least every three or four months or his “legs go out.” Hughey said that he told his supervisor that he fell because his legs “gave out.”
Records from Cracker Barrel do not contain a report indicating that Hughey fell or was injured in September 2011. There is, however, an “Incident Abstract” indicating that on the evening of July 10, 2011 — the day before Hughey reported to Dr. Roberts’s nurse that he had fallen at work and hurt his back — Hughey reported that he had hurt his back when he tripped on an object while “carrying [a] disher from grill to dish.” Dr. Roberts was asked during his deposition whether, assuming Hughey’s fall at the Cracker Barrel restaurant occurred on July 10, 2011, Hu-ghey’s statement that his legs “gave out” on him because he had not timely received his injections would be correct. Dr. Roberts said no, “that certainly is not a valid statement.”
In addition to the reported July 10, 2011, incident at the Cracker Barrel restaurant, the record contains an “Emergency Physician Record — Fall” from Athens-Limestone Hospital dated June 14, 2011— approximately one week after Hughey received his June 6, 2011, injections from Dr. Roberts. The “Emergency Physician Record” indicates that, on that occasion, Hu-ghey was complaining of lower back pain and pain to both knees. The “context” portion of the record contains three options for the fall, “tripped/slipped/lost balance.” The word “slipped” is circled, and there is a notation: “@ Hardee’s Sts wet floor.” Hughey was diagnosed with contusions to his knees and lumbosacral strain and released to return home and take prescribed Norco, a narcotic pain reliever. Athens-Limestone Hospital emergency-department records indicate that Hughey returned to the emergency department on June 17, 2011. At that time, X-rays were taken of his spine and both knees. Hu-ghey was given Toradol, a nonsteroidal anti-inflammatory drug used to decrease pain or swelling, and instructed to return to the emergency department if his pain grew worse. He was also told to follow up with pain medication as needed and to ice sore areas.
Hughey testified that, on Father’s Day 2011, he slipped and fell in water on the floor at a fast-food restaurant and landed on his back. An ambulance took him to the hospital, Hughey said. X-rays were taken, and Hughey said that, as a result of the fall, he was “bruised up” but nothing was broken. He said that the fast-food restaurant paid his medical bills for his treatment related to the incident.
Hughey visited Dr. Roberts again on October 11, 2011. Records from that visit indicate that Hughey had tested positive for the use of cocaine in a drug screen routinely given to Dr. Roberts’s patients. Dr. Roberts testified that his usual practice is to dismiss patients who test positive for illegal drugs. In this case, however, Hughey told Dr. Roberts that he had not taken cocaine and that he believed someone had given it to him without his knowledge. Dr. Roberts recommended to Hu-ghey that he report his suspicions to police and told Hughey that another positive test for illegal drugs would result in his dismissal from Dr. Roberts’s care.
The notes from Hughey’s October 11, 2011, visit show that Hughey told Dr. Roberts’s nurse that he had been hit in the back with debris from a tornado in April 2011. In his deposition, taken August 29, *159 2012, Hughey testified that he had been in his house when a tornado hit the house. He said that the house was “gone” but that he had not been injured. He also stated that a wall had fallen on him.
The October 2011 record also indicates that Hughey stated that his lower back and leg pain was not responding to the injections like it had in the past. Hughey requested Percocet of 10 mg rather than the 7.5 mg pills that he had been taking to relieve pain because, he said, the 7.5 mg pills did not last long enough. According to the medical record, Dr. Roberts did not want to “escalate” the controlled substances Hughey was taking. Dr. Roberts ordered an MRI for Hughey. The MRI was performed on December 1, 2011.[2] It indicated that Hughey had a disk protrusion, also known as a herniated disk, and annular tear on the right side at the L5-S1 level, which is the lower back. Dr. Roberts testified that the herniated disk and annular tear were new injuries that were not attributable to the June 2002 accident. He explained that he believed that, “with respect to [Hughey’s] lower back, the low back, right lower extremity symptoms are probably not related [to the 2002 accident] based on the new findings.”
After receiving the results of the MRI, Dr. Roberts referred Hughey to Dr. Curt Freudenberger, a neurosurgeon. Hughey testified that, in completing a form for Dr. Freudenberger, in response to a question asking him to explain how his injury occurred, he wrote: “fell resulting from legs giving out on me.” On May 2, 2012, Dr. Freudenberger recommended a microdis-kectomy to repair the annular tear. Hu-ghey also told Dr. Freudenberger that, although his back had hurt for the past ten years, the symptoms had become worse during the last several months.
Hughey asked Stutts to pay for the surgery. When Stutts learned that Hughey had been hit in the back by tornado debris and that he had fallen at the Cracker Barrel restaurant and the fast-food restaurant, Stutts filed in the trial court a motion for a determination of whether it was obligated to pay for further medical benefits for Hughey, including the surgery to repair the annular tear, in light of Hughey’s current condition. Discovery on the issue was conducted. On May 15, 2013, Hughey filed a motion to compel Stutts to pay for his medical treatment. He also sought to have Stutts and its claims administrator, Construction Claims Management, held in contempt.
The trial court held an evidentiary hearing on June 26, 2013. At the hearing, Stutts stipulated that it would remain obligated to pay for the injections and blocks Dr. Roberts provided to Hughey, as well as the pain medications he prescribed, to treat Hughey’s back pain. Hughey testified that Stutts had paid all of his medical bills related to his back pain, except for those bills he had received immediately before the trial. He had not yet had the surgery to repair the annular tear.
At the hearing, Hughey testified that his legs, especially his right leg, would unexpectedly “give out” and that “[i]t’d just feel like there ain’t nothing there.” He said *160 that he had fallen numerous times without tripping or slipping on anything. He related incidents in which he had fallen at work but had not been hurt. Before the 2002 accident, Hughey said, he had never experienced problems with his legs or falling unexpectedly.
On July 12, 2013, the trial court entered its findings of fact, conclusions of law, and final judgment. In the judgment, the trial court said that it found Hughey’s testimony to be credible and worthy of belief. It further found that Hughey’s “annular tear at L5-S1 is a direct result of an unexpected fall resulting from weakness and instability in his legs. The instability and weakness in [Hughey’s] legs are a direct result of the original work accident” in June 2002.
The trial court also stated that
“there is no credible evidence submitted by [Stutts] that [Hughey] sustained a new work related injury at Cracker Barrel or a low back injury due to a fall at Hardee’s [fast-food restaurant]. After carefully reviewing the records, the subsequent work accident at Cracker Barrel consisted of (1) a cut to [Hughey’s] abdomen and (2) injuries to [Hughey’s] knees and neck. [Hughey] never filed a lawsuit for worker’s compensation benefits against Cracker Barrel nor did he seek medical treatment from Cracker Barrel for any condition in his low back.”
Based on its findings, the trial court ordered Stutts to approve and pay for the surgery to repair Hughey’s annular tear. It also found Stutts and its workers’ compensation claims administrator in contempt “for violating the future medical provisions of the 2004 Settlement Agreement,” and, as sanctions, it ordered Stutts to pay Hu-ghey’s attorney fee and costs totaling $5,779.10. Stutts filed a motion to alter, amend, or vacate the July 12, 2013, judgment. It also sought to stay enforcement of the judgment pending appeal. The trial court denied both motions on September 20, 2013. Stutts timely appealed.
Stutts contends that substantial evidence does not support the trial court’s finding that Hughey’s herniated disk and annular tear at L5-S1 were the direct consequence of the 2002 work-related accident. Stutts also asserts that the trial court applied the incorrect standard of proof in reaching its conclusion that Stutts was obligated to pay for the surgery to repair the annular tear.
The standard this court uses to review workers’ compensation cases is well settled:
“Section 25-5-81(e), AIa.Code 1975, provides the standard of review in workers’ compensation cases:
“ ‘(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“ ‘(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.’
“Substantial evidence is ‘ “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).”
White Tiger Graphics, Inc. v. Clemons, 88 So.3d 908, 910 (Ala.Civ.App.2012).
In determining that Stutts was responsible for paying for the surgery to repair Hughey’s annular tear, the trial court relied on Erwin v. Harris, 474 So.2d 1125 *161 (Ala.Civ.App.1985). In Erwin, this court reversed a judgment denying an employee workers’ compensation benefits because, this court determined, the evidence indicated that the injuries the employee had sustained in a fall at home were caused by weakness in the employee’s leg stemming from a previous work-related injury. Therefore, this court held, the “new” injuries were compensable as a direct and natural consequence of the original, com-pensable injury, -writing:
“It is well established that, under general workmen’s compensation law, an injury which occurs subsequent to an original, compensable injury is itself compensable if it is the direct and natural result of the original, compensable injury. 1 A. Larson, The Law of Workmen’s Compensation, §§ 13.10, 13.11, 13.12 (2d ed.1985). This rule applies regardless of whether the subsequent injury is an aggravation of the initial compensable injury or a new and distinct injury. Larson, supra. Therefore, if an injury occurs as the direct and natural result of the original, compensa-ble injury, it is a reasonable conclusion that any medical expenses incurred by the employee for the subsequent injury are those that the employer is required to pay as ‘reasonably necessary’ under § 25-5-77(a)[, Ala.Code 1975].”
474 So.2d at 1127.
“The burden is upon the claimant to establish the causal connection between the initial, compensable injury and the subsequent injury for which benefits are sought. Houston v. Louisiana Land Exploration Company, 459 So.2d 912 (Ala. Civ.App.1984).” Erwin, 474 So.2d at 1127.
In this case, there is no dispute that Hughey suffered a compensable injury to his back in the 2002 accident and that he was still receiving treatment for the pain he continued to have because of that injury. The issue the trial court had to decide was whether Hughey presented substantial evidence indicating that the annular tear for which Hughey sought surgical treatment and the herniated disk were a direct and natural result of the original injury. As mentioned, in the judgment, the trial court found that the herniated disk and annular tear were a direct result of a fall or falls that were caused by the weakness and instability of his legs and that the weakness and instability were a direct result of the 2002 accident. The trial court went on to find that “there is no credible evidence submitted by [Stutts] that [Hughey] sustained a new work related injury at Cracker Barrel or a low back injury due to a fall at [the fast-food restaurant].”
There is evidence in the record to support the finding that, as a result of his 2002 injury, Hughey sometimes suffers from weakness and instability in his legs, causing him to fall. However, there is also evidence indicating that at least some of Hughey’s falls in the months leading to his feeling of increased back pain were the result of his tripping over an object or slipping in water.
The “incident abstract” from Cracker Barrel indicates that on July 10, 2011, Hughey tripped over something as he was carrying a “disher” from the grill to a dish. The next day, Hughey saw Dr. Roberts and reported that he had fallen at work and hurt his back. There is no evidence tending to indicate that Hughey’s July 2011 fall was the result of his legs “giving out.” Hughey testified that he fell at the Cracker Barrel restaurant in September 2011 — and he may have — but objective evidence also indicates that he fell hard enough on July 10, 2011, to warrant written documentation of the incident. If Hu-ghey fell at the Cracker Barrel restaurant in September 2011, there is no record of it. *162 Other than the cause of the fall, the details that Hughey gave regarding the September 2011 fall — for example, the name of the supervisor who completed the incident abstract and the fact that Hughey was given a slip of paper and told to go to the hospital — match the details of the July 2011 fall.
The documented July 2011 fall, which, as mentioned, was significant enough that Hughey mentioned it to Dr. Roberts, occurred only one month after Hughey received his last injections from Dr. Roberts. In his testimony, Hughey said that the fall occurred when his legs “gave out,” which he attributed to not having had his injections within the last three or four months before the fall. Dr. Roberts, in talking about the July 2011 fall mentioned in Hu-ghey’s records, said that Hughey’s explanation was “certainly not a valid statement.”
Hughey also said that, when he fell at the Cracker Barrel restaurant in September 2011, he fell “flat on [his] back” and hurt his “whole back area, especially in [his] butt area.” He declined treatment, however, because, he said, he thought the fall was not Cracker Barrel’s fault. A review of the evidence, including Hughey’s own testimony, does not support the trial court’s finding that the injuries Hughey received while working for Cracker Barrel consisted only of a cut to his abdomen and injuries to his knees and neck. Instead, substantial evidence indicates that Hughey hurt his back in the July 2011 fall.
As to the fall at the fast-food restaurant, Hughey’s own testimony was that, on Father’s Day 2011, he slipped in water that was on the floor, fell, and landed on his back. That fall was significant enough that Hughey had to be transported to the hospital by ambulance. Hospital emergency-department records from the date of the incident indicate that Hughey complained of lower back pain. The records also indicate that Hughey told hospital personnel that day that he slipped and fell in water. Hughey returned to the emergency department a few days later, again complaining of lower back pain. The fast-food restaurant paid for Hughey’s treatment. The fall at the fast-food restaurant occurred approximately one week after Hughey received injections from Dr. Roberts. There was no evidence indicating that Hughey’s legs gave out on him on that occasion.
Given the evidence in the record, we have no choice but to disagree "with the trial court’s conclusion that there was no “credible” evidence to indicate that Hu-ghey suffered a new injury to his lower back in either the 2011 fall at the Cracker Barrel restaurant or the fall at the fast-food restaurant on Father’s Day 2011, especially when Hughey himself testified that he hurt his back in both incidents.
As mentioned, as the party seeking benefits, Hughey-bore the burden of demonstrating that the herniated disk and annular tear at the L5-S1 level of his spine, i.e., his lower back, were the direct result of the injuries he received in the 2002 accident. This court does not doubt Hughey’s testimony that he sometimes falls because his legs “give out.” However, the evidence indicates that the two most noteworthy falls Hughey suffered in the months just before he began experiencing more pain in his back occurred not because his legs “gave out,” but because he tripped over something or slipped in water. Furthermore, even if we were to hold that substantial evidence supported a finding that the 2011 fall at the Cracker Barrel restaurant occurred because Hughey’s legs “gave out,” there is no dispute that the fall at the fast-food restaurant occurred because he slipped in water. We note that the fall at the fast-food restaurant was the only one *163 for which Hughey sought medical treatment. There is also evidence, namely Hu-ghey’s own testimony, indicating that debris hit him in the back or a wall fell on him when his house was destroyed by a tornado in April 2011.
Although it is possible that Hughey’s herniated disk and annular tear occurred from a fall when his legs “gave out,” it is equally possible that those injuries occurred in one of the incidents discussed above. Dr. Roberts, who has been treating Hughey for back pain for a decade, said that the annular tear was a new injury, and he did not testify as to a specific cause for the annular tear. “ ‘It is a well established principle that evidence presented by a [workers’] compensation claimant must be more than evidence of mere possibilities that would only serve to “guess” the employer into liability.’ ” Ex parte Southern Energy Homes, Inc., 873 So.2d 1116, 1122 (Ala.2003) (quoting Hammons v. Roses Stores, Inc., 547 So.2d 883, 885 (Ala.Civ.App.1989)). Additionally, the appellate courts have often repeated that evidence that serves only to guess an employer into liability is not substantial evidence sufficient to support a compensability determination. Wal-Mart Stores, Inc. v. Orr, 29 So.3d 210, 220 (Ala.Civ.App. 2009) (holding that evidence demonstrating a mere possibility that plaintiffs left-hip injury was the natural consequence of her left-knee injury did not constitute substantial evidence to support judgment against employer); see also SouthernCare, Inc. v. Cowart, 146 So.3d 1051, 1063 (Ala.Civ.App. 2013).
Because the evidence in this ease demonstrates only a possibility that Hughey’s herniated disk and annular tear were caused by a fall that was a natural consequence of the injuries he sustained in the 2002 accident, it does not constitute substantial evidence to support the trial court’s judgment ordering Stutts to pay for the surgery needed to repair the annular tear. Accordingly, the judgment as to this issue must be reversed.
Stutts also contends that the trial court abused its discretion by holding Stutts in contempt for violating the future-medical provisions of the 2004 settlement agreement by not paying for the surgery to repair Hughey’s annular tear.
“When no statute applies, workers’ compensation actions are governed by the Alabama Rules of Civil Procedure. See § 25-5-88, Ala.Code 1975, and Rule 81, Ala. R. Civ. P. Rule 70A, Ala. R. Civ. P., governs the procedure for finding a party in contempt of court, and an employer who is a party to a workers’ compensation case may be sanctioned for contempt by a trial court’s following that rule. See Travelers Indem. Co. of Illinois v. Griner, 809 So.2d 808, 814-15 (Ala.2001).”
Dollar Tree Stores, Inc. v. Ates, [Ms. 2120577, Feb. 21, 2014] - So.3d -, -(Ala.Civ.App.2014).
“Rule 70A, Ala. R. Civ. P., has governed contempt proceedings in civil actions since July 11, 1994. Rule 70A(a)(2)(D) defines ‘civil contempt’ as a ‘willful, continuing failure or refusal of any person to comply with a court’s lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with.’ ”
Stamm v. Stamm, 922 So.2d 920, 924 (Ala. Civ.App.2004). Moreover, to hold a party in contempt under Rule 70A(a)(2)(D), Ala. R. Civ. P., the trial court must find that the party willfully failed or refused to comply with a court order. See T.L.D. v. C.G., 849 So.2d 200, 205 (Ala.Civ.App.2002).
“The issue whether to hold a party in contempt is solely within the discretion of the trial court, and a trial court’s *164 contempt determination will not be reversed, on appeal absent a showing that the trial court acted outside its discretion or that its judgment is not supported by the evidence. Brown v. Brown, 960 So.2d 712, 716 (Ala.Civ.App. 2006) (affirming a’trial court’s decision not to hold a parent in contempt for failure to pay child support when the parent testified that he had deducted from his monthly child-support payment the amount he had expended to buy clothes for the children).”
Poll v. Poh, 64 So.3d 49, 61 (Ala.Civ.App. 2010).
Pursuant to the 2004 settlement agreement, Stutts was obligated to pay for any future medical treatment that Hughey required in connection with injuries arising from the 2002 accident. An employer
“is required to pay for only that medical treatment reasonably necessary to treat [an employee’s] work-related, injury and associated symptoms. See Ala.Code 1975, § 25-5-77(a) (stating, among other things, that an employer must pay for ‘reasonably necessary medical and surgical treatment’). Of course, if a dispute arises over whether a particular course of medical treatment is reasonable, the issue may be submitted to the trial court for resolution. § 25-5-77(a) (providing that disputes as to the necessity of medical services requested are to be determined by the court).”
Ex parte El Reposo Nursing Home Grp., Inc,, 81 So.3d 370, 374 (Ala.Civ.App.2011); see also Ex parte Steve Cagle Trucking Co., 989 So.2d 560, 562-63 (Ala.Civ.App. 2008) (holding that an employer is not financially responsible for medical and surgical treatment obtained by an employee for conditions unrelated to an accident arising out of and in the course of the employee’s employment).
The Alabama Workers’ Compensation Act (“the Act”), § 25-5-1 et seq., Ala. Code 1975, contemplates that disputes will arise between employers and employees as to the necessity and reasonableness of medical treatment. The Act sets forth a mechanism by which injured workers can challenge employers’ contentions that certain medical treatment is not necessary or reasonable and by which employers can challenge workers’ contentions that it is.
“In case of a dispute as to the necessity of medical or surgical treatment, § 25-5-77(a), Ala.Code 1975, provides that the circuit court having jurisdiction over the compensation claim of the employee shall determine the controversy. The power of the trial court to determine the ‘necessity’ of medical or surgical treatment naturally includes the power to determine whether the treatment is necessary due to injuries arising out of and in the course of the employee’s employment or whether the treatment is necessitated by conditions unrelated to the employee’s employment.”
Ex parte Publix Super Markets, Inc., 963 So.2d 654, 658 (AIa.Civ.App.2007) (emphasis added).
Stutts clearly had the right to dispute whether the surgery to repair Hu-ghey’s annular tear was reasonably necessary as part of its obligations pursuant to the 2004 settlement agreement. Id.; see also Ex parte Massey Chevrolet, Inc., 23 So.3d 33, 41-42 (Ala.Civ.App.2009). Given the facts of this case, Stutts had a reasonable basis for bringing the dispute before the trial court for a resolution, as provided for in the Act. As previously discussed, Hughey failed to meet his burden of demonstrating that the surgery to repair the annular tear was necessitated by conditions that were a direct result of the 2002 accident. Based on the record before us, we hold that there was no evidence indicat *165 ing that, in disputing its obligation to pay for the surgery — -which it had every right to do — Stutts wilfully failed to comply with the 2004 settlement agreement. Therefore, the trial court abused its discretion in finding that Stutts was in contempt for “violating” the 2004 settlement agreement and ordering it to pay “contempt sanctions” of $5,779.10. Accordingly, the trial court’s judgment as to this issue must be reversed.
For the reasons set forth above, the judgment of the trial court is reversed, and the cause is remanded for the trial court to enter a judgment consistent with this opinion.
Hughey’s request for an attorney fee on appeal is denied.
REVERSED AND REMANDED.
PITTMAN, THOMAS, and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.

. The 2002 accident occurred when Hughey was working as an electrician’s helper at a construction site. Two rolls of wire weighing about 250 pounds each fell from a forklift onto Hughey.

. Evidence also indicates that on March 7, 2012, Hughey again fell while working at the Cracker Barrel restaurant. The "Employer’s First Report of Injury” form that was completed the next day indicates that, on that occasion, a water hose or "liquid/grease spill” caused Hughey to slip and fall. In that fall, Hughey injured his knees and neck. Because the March 7, 2012, fall occurred after the MRI showed the annular tear, it can definitely be ruled out as the cause of the tear. Hughey testified that, in addition to his falls, he cut his abdomen while he was employed by Cracker Barrel. At the time of trial, Hughey's employment with Cracker Barrel had been terminated for reasons unrelated to this case.